John W. PURVIS et al., Appellants,

v.

Violet Ogden MOREHEAD et al., Appellees.

No. 3457.

Court of Civil Appeals of Texas.

Waco.

July 3, 1957.

Rehearing Denied July 25, 1957.

---

Dee Brown Walker and Albert Strawn, Dallas, for appellant.

Jackson C. Burroughs and Bowyer, Gray, Thomas, Crozier & Harris, Dallas, for appellee.

McDONALD, Chief Justice.

This is a suit for $5,100 paid by defendants Purvis et al., to the Mercantile National Bank at Dallas, as trustee, for the option to purchase certain lease contracts pertaining to real estate in Mexico, from plaintiffs. A statement is necessary. Judge Robert Ogden, deceased, in 1944, by certain lease contract agreements, acquired from a General Vargas in Mexico, (1) a 75 year lease on approximately 120,000 acres of land in the State of Durango, Mexico, (2) title to the trees and timber on such land for 75 years, (3) option to purchase the land for $1,000, or right to designate a purchaser for such sum. During Ogden's lifetime he made certain fractional assignments in his *lease contract* to Conrad, Neel and DeBogory. After Ogden's death his widow married

Morehead, and is administratrix of the Ogden estate.

In December 1953 Purvis et al. defendants herein, got in touch with Mrs. Morehead et al. plaintiffs herein, regarding the possible sale to them of the timber contracts.

Mrs. Morehead et al. on 17 December 1953, entered into a written contract with Purvis et al. whereby the sellers gave an option for a period of 7½ months to the purchasers to buy the timber lease for the sum of $225,000. The consideration for the option was $8,100 to be paid as follows: $100 cash upon signing the option contract; $1,000 cash on 4 January 1954; $1,000 cash on the 4th of each month thereafter until the $8,100 was paid. Such payments were to be made to the Mercantile National Bank at Dallas, and provided that if the purchasers exercised the option the $8,100 should be applied on the purchase price. It was agreed that if purchasers fail for any reason to make the $1,000 payments on the dates specified, then the contract would become null and void and they would forfeit to sellers all money paid to the bank. It was further agreed that purchasers were to make their own investigation as to "the good and marketable title of the contracts, assignments, and leases", and further, that if purchasers should make any objections to the title they should notify the sellers in writing within a period of 30 days of the date of the contract, and that sellers shall be given a 30 day period in which to meet and cure such objections, *and if the sellers fail to cure their objections,* then purchasers were given the option to declare the contract null and void and to recover any amounts of money paid to the Mercantile National Bank under the terms of the contract. The instrument then continues:

"For the considerations as are herein expressed, the undersigned sellers, jointly and severally, do hereby make the following representations, covenants, and warranties:

"(1) That the said leases, contracts and agreements (between Judge Ogden and General Vargas), hereinabove referred to, and made a part and attached to this instrument, are valid agreements and are in full force and effect and that no default with respect to any of the provisions, provided for therein, have been violated by any of the undersigned sellers.

"(2) That the sellers are the owners of all the benefits, estates, right, claims, properties and remedies as are set forth in the instruments attached hereto and that the sellers represent, covenant, and warrant that they have good right and authority to make this sale and assignment and execute and deliver this contract, leases and agreements, bill of sale and assignment, and the same conveys and vests in the buyer good and valid title to the properties, rights, and benefits in and under and in anywise growing out of the said instruments hereinbefore mentioned.

"(3) That the sellers represent and warrant that the benefits, estates, rights, claims, liens, demands and remedies as set forth in the leases, agreements and contract, attached hereto and referred to herein are free and clear of all liens, claims, and encumbrances, including taxes of any and every nature * * *"

Defendants paid the $100 on 17 December 1953 and $1,000 on 4 January 1954. 4 February 1954, 4 March 1954, 4 April 1954, and 4 May 1954, making a total of $5,100 paid, but did not pay the $1,000 due on 4 June 1954. Instead, defendants wrote plaintiffs' attorney, Mr. Jackson C. Burroughs, referring to objections to the title which had not been cleared up, and wrote the Mercantile National Bank calling attention to the provisions in the escrow that if title defects be not cured, purchasers should receive back the money paid on the option.

Thereafter on 10 July 1954, plaintiffs filed this suit for the $5,100, alleging breach of the contract by defendants. The bank turned the $5,100 into the registry of the court; and defendants defended, asserting they were entitled to the $5,100 since plaintiffs had breached the contract in not curing objections made to the title and in not having good and marketable title to the leases, timber, etc. on the land in Mexico. Trial was to a jury. The court defined "good and marketable title", when applied to the property in question:

"To mean one reasonably free from such doubt as would affect the market value of the estate; one which a prudent man with knowledge of all the facts and their legal bearing, would be willing to accept; not doubts based on captious, frivolous or astute niceties, made up for the occasion, but grave and reasonable doubts, such as would induce a prudent man to hesitate in accepting a title affected by them, and such as would make it possible or reasonably probable that the purchaser's right may become a matter of investigation, and thus affect its value. A marketable title is one that will bring as high a price in the market with the purchaser's objection to its sufficiency as without. Marketable title is not dependent on whether the purchaser, if sued, could successfully defend such title against those suing."

And then submitted Issue 1:

"Do you find from a preponderance of the evidence that plaintiffs, on June 3rd, 1954, had a good and marketable title to the property to be conveyed by the contract in question, as the term 'good and marketable title' is defined herein?" To which the jury answered: *"They had a good and marketable title."*

Based on the foregoing the Trial Court entered judgment for plaintiffs and against defendants for the $5,100.

Defendants appeal on 23 points, which contend, among other things: (1) Plaintiffs'

title was not good and marketable as a matter of law. (2) The jury finding that such title was good and marketable is against the great weight and preponderance of the evidence. (3) The Trial Court erred in admitting various evidence. (4) The Trial Court erred in refusing to submit certain requested issues. (5) The Trial Court erred in not granting defendants a continuance.

This case was tried in its entirety by both plaintiffs and defendants on the issue as to whether or not plaintiffs had a good and marketable title to the lease-timber contracts located on land in the Republic of Mexico, and we think the dominant issue in the case is whether or not plaintiffs had good and marketable title to the (1) 75 year lease on the 120,000 acres in the State of Durango, Mexico, (2) title to thé trees and timber on such land for 75 years, (3) an option to purchase the land or designate a purchaser for same for $1,000.

 Plaintiffs derive their rights and title from the lease contracts executed between Judge Ogden and General Vargas in 1944. The lease contracts were made in Mexico and concerned land and timber located in Mexico. This being true, the marketable title to the lease-timber-contracts must be determined under the laws of the Republic of Mexico. Since Texas courts cannot take judicial knowledge of the laws of a foreign country, such laws must be proved as facts in each particular case. See: Sierra Madre Construction Co. v. Brick, Tex.Civ.App., 55 S.W. 521; Grange v. Kayser, Tex.Civ.App., 80 S.W.2d 1007; Illinois Central Ry. Co. v. Ryan, Tex.Civ. App., 214 S.W. 642; El Paso Electric Ry. Co. v. Carruth, Tex.Civ.App., 208 S.W. 984; Cuba R. Co. v. Crosby, 222 U.S. 473, 32 S. Ct. 132, 56 L.Ed. 274.

With the foregoing principles in mind, let us review the evidence applicable to whether or not the Ogden-Vargas lease contract agreements were or were not valid in Mexico.

There is in evidence the letter written in April 1948 by Mexican lawyer Palacio to Mr. E. G. Moseley. Palacio had been Judge Ogden's Mexico lawyer and Moseley was attorney for Judge Ogden's estate. Pertinent parts of this letter which refer to the validity of the title are quoted:

"As you know, Mr. Ogden bought in Durango 5 lots of lumber land in the County of San Andres Victoria, of this State, totaling 52,000 hectares.

"As a foreign citizen, Mr. Ogden could not buy these lands in his name, and he bought them in the name of General Juan B. Vargas, who died last November. Mr. Ogden agreed to give General Vargas a participation on the lumber which these lands produced, but General Vargas recognized the lands as belonging to Mr. Ogden. Of this I have written proof.

"After General Vargas' death and following instructions of Mr. Ogden, I talked to General Vargas' widow and she consented to keep her husband's will and the agreement which he had with Mr. Ogden. Legally, however, these lands will have to go to General Vargas' heirs and Federal and State taxes must be paid. These taxes will not be less than $25,000—money Mex. * * *"

There is in evidence the title opinion dated 6 May 1954, by Mexican lawyer Palacio concerning the title to the lease contracts in question, pertinent portions of which are:

"* * * and have not found a resolution of the Judge conceding the authorization requested by Mrs. Ogden Morehead, * * *"

"In our State, in order for Mrs. Violet Ogden Morehead to be in a position to sell the property of inheritance of her husband, it would be necessary to have previously paid the inheritance taxes imposed * * *."

IV.

"1. The instrument to which we have just referred in the last paragraph

has very great legal deficiencies and which we here point and are based on the fact that the buyer, Mr. Robert Ogden, was of an American nationality.

"2. Pertaining to a contract of lease of real property as was executed between Messrs. Ogden, of American nationality, and Vargas for the term of 75 years, should have been previously requested and respective permit or authorization from the Secretary of Foreign Affairs according to a resolution of same Secretary dated 6th of February, 1930, and communicated to the Notaries in the City of Mexico. This resolution is based on Article 49 of the Law of Citizenship and Naturalization which establishes as a sale, all leases of real property whenever the term of the lease extends ten years.

"Furthermore, in this case, no permit was asked for from the Secretary of Foreign Affairs, previous to the execution of the contract.

"3. The sale of the lumber and existing trees on the property we are dealing with, legally should be considered as a sale of real property, and in this case, in conformity with the provision of Par. 1, Art. 27 of the Constitution and Arts. 1 and 2 of the Regulation of the Organic Law of Par. 1 of the aforementioned Article 27, it should have been required also the previous authorization from the Secretary of Foreign Affairs, it being the buyer was of American Nationality, in the usual manner, for the execution of the contract so many times referred to. This requisite was not complied with.

"4. Finally, like authorization of the Secretary of Foreign Affairs should have been requested with respect to contract of Promise to Sell of the property that we are dealing with, for the identical reason, that the buyer was a foreigner. This was not done.

"5. The penalty for these consistent omissions, as we have just explained, not to have asked for the respective previous authorizations of the Secretary of Foreign Affairs for the Celebration of the Contract in the case where the buyer was a foreigner, is clearly specified in Art. 8 of the Organic Law Par. 1 of Art. 27 of the Constitution and which in the text states: *'The executed acts and contracts executed against the provisions contained in this law will be null entirely and legally'*—In other words, the contract we are dealing with is legally annulled."

Article V. of this opinion states that the heirs of General Vargas are in possession of the property, have persons taking care of it, have tried to sell or rent it, have paid taxes on the property, and consider the property as their own. The opinion further states that the writer thinks that it would be very difficult for the sellers to fulfil their obligations.

The witness Molina, a Mexican lawyer, testified that the lease contracts involved herein, under Mexican law, are void and invalid absolutely. The witness Molina also identified Mexican lawbooks which were offered in evidence and which, among other things, stated: (1) All leases of real property shall be treated as a sale if the term of such lease exceeds ten years. (2) Only Mexicans have the right to acquire ownership of lands (unless certain agreements not involved herein are entered into). (3) Trees attached to the land constitute real property.

The witness Cardenas, a Mexican lawyer, testified he had examined the title to the property and that the lease contracts of plaintiffs were valid and good agreements under the laws of Mexico, and that the plaintiffs had good and valid title to the properties, rights, and benefits, as shown by the agreements. The lease contracts themselves are in evidence and the Notary who certified same sets out in effect that same are valid.

The witness Burroughs, who is attorney for plaintiffs, testified that Purvis told him that defendants were not going to exercise their option because a contemplated sale of the lease contracts by them to third parties had fallen through.

The foregoing recitation of the evidence as applicable to the question of title is of necessity short, but is a fair summary of same.

■ Plaintiffs contended that the question of whether the title and lease contracts were good and marketable under Mexican law became a fact question, and that the jury's finding that "they do have a good and marketable title" resolves the matter, and that they are entitled to the $5,100. Plaintiffs further contend that since defendants did not present title objections within thirty days, that they are entitled to the $5,100. In this connection the Trial Court apparently held and we hold that the parties, by their conduct and actions, waived strict compliance with this provision of the contract. As previously noted, both parties apparently tried the case on the theory of whether plaintiffs had marketable title—and such issue was submitted to the jury, which found that they did have.

■ Now, while we agree that whether plaintiffs had a marketable title was the issue in the case, and that the determination of such presented a fact question, which in this case was for the jury to determine; and while we further recognize that there was some evidence in the record that such title was good and marketable under the laws of Mexico, we think that the jury's finding on such issue, in view of the evidence as a whole, is against the great weight and preponderance of the evidence. It is our duty to weigh and consider all of the evidence in the case, upon proper assignment, that which supports the findings and judgment, and that which does not, and to set aside the judgment if we conclude that the findings and judgment are so against the weight and preponderance of the evidence as to be manifestly unjust, regardless of whether there is some evidence of probative force to support it. Art. 5, Sec. 6, Tex. Constitution, Vernon's Ann.St.; In re King's Estate, 150 Tex. 662, 244 S.W.2d 660; Chantly v. Chrystal, Tex.Civ.App., 274 S.W.2d 765 (W/E Dis.).

Here we have in evidence the title opinion of Mexican lawyer Palacio, as well as the letter written to Mr. Moseley, both of which reflect that an American citizen cannot buy land in Mexico, and the opinion sets forth that the sale of standing timber is a sale of real estate—and that a lease of more than ten years duration is sale of real estate, under the Mexican laws. There are further in evidence Mexican law books, properly identified by Mexican lawyer Molina to the same effect. Lawyer Molina further testified that the plaintiffs' lease contracts were null and void. As against this evidence is the testimony of Mexican lawyer Cardenas that the title and lease contracts are valid and marketable, and the recitation of the Notary who certified the lease contracts that they are valid. There is further in evidence the fact that inheritance taxes on neither Judge Ogden nor General Vargas have been paid in either this country or Mexico as reference this particular property—and finally there appears the fact that General Vargas' heirs are in possession of the property, paying taxes on same, trying to sell or lease it, and claiming it as their own.

When we consider the definition of good and marketable title as submitted by the Trial Court, we conclude that the jury's answer is against the great weight and preponderance of the evidence and requires a Reversal and Remand of the case. Defendants have complained of various other acts of the Trial Court, but in view of another trial, it is not necessary to discuss same.

The judgment of the Trial Court is accordingly reversed and the cause remanded.