Winton WELCH and Henry A. Spivey

v.

Dorothy Jo SHAVER et vir, J. D. Shaver.

No. 7123.

Court of Civil Appeals of Texas.

Amarillo.

Nov. 6, 1961.

Rehearing Denied Dec. 4, 1961.

Thompson, Knight, Wright & Simmons, Dallas, for appellants.

Woodgate, Richards & McElhaney, Dallas, for appellees.

**CHAPMAN, Justice.**

This is an appeal by defendants below, Winton Welch and Henry A. Spivey, osteopathic physicians, from a judgment of the trial court based upon a jury verdict for Dorothy Jo Shaver, joined by her husband, J. D. Shaver, in a malpractice case against the two named defendants. Appeal was perfected to the 5th Supreme Judicial District, whose court sits in Dallas, and the case transferred to us by the Supreme Court for determination.

In September, 1958, Mrs. Shaver, then 29 years of age and the mother of three children went to the offices of Drs. Welch and Harakal, osteopaths, in the city of Mesquite in Dallas County to seek relief from a cramping in her lower stomach. Dr. Harakal first saw her and after examining her told her that she needed surgery to correct the position of her uterus. In November, 1958 Dr. Welch examined her and told her the same thing. Then in December, 1958, immediately after Christmas, she was placed in East Town Osteopathic Hospital in Dallas County to be prepared for surgery. At that time Dr. Spivey, an osteopathic specialist in obstetrics and gynecology, gave her a pelvic examination. Before the beginning of surgery she was given the frog test for pregnancy, which, according to the osteopaths, showed negative. On December 29, 1958, when her abdomen was opened for surgery Drs. Spivey and Welch discovered that she was pregnant. Despite such discovery they continued with the uterine suspension. Severe and painful consequences resulted. One objective symptom of her pain appeared in a dimple of one to two centimeters depth overlying the operative scar in the mid-portion of her lower abdomen, which later surgery indicated was caused by adherence of the uterus to the anterior abdominal wall. During the time appellee was suffering so much following the surgery by the osteopaths she consulted Dr. Joey M. Pirrung, M. D., a young general practitioner. Feeling the need of a specialist in the case he called in

Dr. Robert G. Campbell, who did a caesarean section to deliver the child at the end of the gestation period because its head could never engage the pelvis for normal delivery.

During the progress of the trial the court permitted a trial amendment to be filed by appellee which alleged negligence on the part of appellant "in proceeding to perform a suspension type operation upon Mrs. J. D. Shaver after they had learned that she was pregnant." The case was submitted to the jury upon this one ground of negligence.

■ The sufficiency of the evidence to sustain the verdict was dependent, at least in part, upon the testimony of the two medical doctors, Dr. Pirrung and Dr. Robert G. Campbell, Chief of Obstetrics & Gynecology at the University of Texas Medical School in Dallas and a specialist in that field of medicine. Therefore, we are at the outset presented with the question of whether the testimony of the medical doctors was admissible against the osteopaths in the field of obstetrics and gynecology.

In the landmark case of Bowles v. Bourdon, 219 S.W.2d 779 at page 782 our Supreme Court has announced the general rule with respect to the evidence necessary to establish a cause of action against one's doctor for malpractice in the following language:

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment unless he proves by a doctor of the same school of practice as the defendant; (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."

Some 4 years later the same court properly recognized that it would be utterly unrealistic to hold that medical witnesses would be incompetent to give opinion testimony against osteopaths in what constitutes the proper use of a spinal needle in administering a spinal anesthetic, where the proof showed that witnesses representing both the medical and osteopathic schools were trained in the use of a spinal needle in administering a spinal anesthetic and that both were trained that it was highly dangerous to give the anesthetic above the first lumbar vertebra.[1]

In that same case Justice Calvert, now Chief Justice of the court, said "some of the courts of other states recognize that the general rule of exclusion is subject to certain qualifications and exceptions," and then named two exceptions into which the facts brought his case. One of those exceptions was "where the particular subject of inquiry is common to and equally recognized and developed in all fields of practice."

■ In the latest case we have seen on the competency of medical doctors to testify against those of the osteopathic school[2] Justice Young of the Dallas Court of Civil Appeals has said: "If the methods, training and dangers incident to the operation in question are common to both schools of medical practice and equally recognized," the testimony of Drs. Pritchard and Ware[3] in our opinion, is brought well within the qualification announced in Porter v. Puryear, supra.

We have carefully studied the 445-page Statement of Facts in the instant case and find that it is replete with testimony, particularly from the osteopaths, to the effect that in the field of obstetrics and gynecology both schools of training use practically the

1. Porter et al. v. Puryear, 153 Tex. 82, 262 S.W.2d 933, 936.

2. Miles v. Meadows, 309 S.W.2d 284–287 (N.W.H.)

3. Doctors Pritchard and Ware are practitioners of the medical school of practice.

same text books in their instruction, the osteopaths take many of the same medical journals as the M.D.'s, use many of the same techniques, and recognize the same medical writers in that field as authority. For example, both medical witnesses and both osteopathic defendants recognize the writing of TeLinde[4] as authority in the field of gynecology.

As one example of the testimony of the osteopaths in this connection Dr. Welch said:

"A. With the exception of osteopathic principles and practice, and you'll find the osteopathically-edited books for that particular part of the educational process; but your basic sciences and your other sciences (surgery, obstetrics, gynecology, and so forth) medical texts are used."

Another illustration is in the testimony of Dr. Spivey wherein he said in substance that the only difference in the teaching and training of the two schools were those instances in which the osteopaths use manipulation type therapy to correct something of a mechanical nature, such as a crick in the neck, instead of giving aspirin or narcotics.

Dr. Pirrung testified that prior to about 1953 all medical schools were taught to do uterine suspensions, and that only late graduates, those since about 1953 have been discouraged in doing them and that he believes in other methods. So, it would be just as reasonable for us to say that in an OB-Gyn case [5] Dr. Pirrung would be an incompetent witness against another M.D. who was educated before 1953, merely because his individual opinion reflects the recent developments in the profession, as it would be for us to say the medical doctors were incompetent to give testimony against the osteopaths in this case. We believe such theory would be, as Chief Justice Calvert has said, unrealistic, would not comport with good reasoning and settled rules of

evidence and would do violence to the doctrine announced in Porter v. Puryear, supra, if we should hold from this record that the medical doctors were incompetent witnesses in the evidence they gave against the osteopathic doctors. We accordingly hold they were competent witnesses to give expert opinions such as they gave in this case.

What we have already said disposes of many of the 26 points raised but we shall attempt to discuss, in groups as far as possible, those points where subjects ancillary to the question already discussed have been raised.

In points 1 and 2 reversible error is urged to an answer by Dr. Pirrung allegedly not responsive to the question and which depended upon hearsay. He was asked if the theory behind a uterine suspension and the reasons why it is done is that it is something that is taught in a normal 4 year course of any medical student, to which he answered: "We are taught not to do it."

We find no reversible error in these two points. In the first place there is testimony of similar meaning in the record contained in the statements of Dr. Pirrung to the effect that late graduates are discouraged in doing such suspensions. Additionally, he was testifying as an expert, and what he was taught goes to the very basis for qualifying him as an expert. Like most experts, the competency of his testimony as an expert would be dependent upon his instructions and training, and therefore not subject to the hearsay rule. Further, we believe it was unnecessary for him to be a specialist in OB-Gyn in order to testify as an expert in this case. It has been textually stated that "* * * in the case of doctors, the courts do not require that they be specialist in the particular branch of the profession concerning which they are called upon to testify. This knowledge may be obtained entirely from a study of technical works

---

4. Dr. TeLinde is Professor of Gynecology at Johns Hopkins University.

5. OB–Gyn as used herein denotes obstetrics and gynecology.

\* \* \*"[6] In any event the points do not show reversible error under rule 434, Vernon's Ann.Texas Rules of Civil Procedure.

We certainly could not say in considering the record as a whole that such testimony was reasonably calculated to cause and probably did cause the rendition of an improper verdict. Shelton v. Belknap, 155 Tex. 37, 282 S.W.2d 682, 687. The points are overruled, as are points 3, 8, and 9 going to the competency of the medical doctors to testify against the osteopaths. The latter points are disposed of in what we said prior to a discussion of the first two points.

■ The 4th point asserts error in permitting Dr. Pirrung to testify "a uterine suspension is not compatable with future pregnancies." The record contradicts the statement in the point. The doctor's testimony as a whole cannot be so construed. He testified that a uterine suspension performed by a shortening of the ligaments would be compatible with future pregnancies. He testified in effect that the type operation performed by appellants was not compatible with future pregnancies. He said objective symptoms showed that something had been sewed to the abdominal wall. "That is correct," he testified in answer to the question: "Something had caused the uteris to be firmly fixed to the front of the stomach wall?" Accordingly, the point is overruled.

The 5th point claims error in permitting the medical doctors to testify that sewing the uterus to the stomach wall would not be compatible with future pregnancies because the witnesses assumed facts not in evidence. The testimony quoted in point 4 and other testimony of similar import require the overruling of this point.

■ The 6th point is overruled wherein error is asserted in Dr. Pirrung's testimony to the effect that it was possible to correct the position of the uterus without surgery. Inquiry was made to the jury as to the neg-

ligence of the osteopaths in performing the operation. Testimony that the uterus could have been corrected without surgery would at least go to the weight of the testimony as to whether there was negligence in what was done. This is particularly true in view of the fact that the surgery was admitted as having been elective rather than an emergency.

What we have said in a discussion of other points makes it unnecessary to write upon points 7, 8, and 9.

■ Point 10 contends there was an invasion of the province of the jury in permitting Dr. Campbell to testify in effect that the operation should not have been performed. His answer was simply the response of an expert to a material hypothetical question. Our Supreme Court has said: "When the issue is one upon which the witness may properly state his opinion, he may do so, notwithstanding his answer embraces the very issue on trial." Scalf v. Collin County, 80 Tex. 514, 16 S.W. 314, 315. See also Federal Underwriters Exchange v. Cost, 132 Tex. 299, 123 S.W.2d 332, 335; 31 Texas Law Review 731, "Invasion of the Province of the Jury", by Justice Norvell.

■ Point 11 asserts error in the testimony by Dr. Campbell to the effect that the adhesions resulted from the prior operation and because it was hearsay and there was no evidence that it had been sewed to the stomach wall. As previously shown there was evidence that the organ had been fixed to the abdominal wall. We believe the record is not clear that such testimony was based upon hearsay, but in any event it would come under the harmless error doctrine of Rule 434, V.A.T.R.

■ Appellants' 12th point asserted error by permitting Drs. Pirrung and Campbell to give their testimony before the filing of the trial amendment upon which the case was tried. If there were insufficient

6. Texas Law of Evidence McCormick and Ray, 2d Sec. 1401 p. 236.

pleadings upon which their testimony was admitted any error was corrected when the trial amendment was filed. The very reason for a trial amendment in pleadings is to correct the pleadings. Otherwise, such amendments would serve no purpose. If the previous testimony would have been admissible after the amended pleadings were filed there certainly would have been no reversible error in permitting the testimony to stay in the record. The point is overruled, as is the 13th point of the same tenor.

Appellant's 14th point contends error in overruling one of their special exceptions, which was cured by the trial amendment just discussed. Even if it should be said that the pleadings were insufficient for appellant to prepare their defenses there still is nothing before us for appellate review. The trial amendment corrected the pleadings, if they needed correcting, and after the amendment was filed they waived any surprise by agreeing to proceed with the trial.

The 15th through the 26th points raise questions of no evidence and the general sufficiency, or great weight and preponderance of the evidence to sustain the verdict. It therefore becomes necessary for this court to weigh and consider that which supports the verdict and that which does not and to set aside the judgment and remand the case if after such consideration, we conclude the verdict is so contrary to the overwhelming weight of all the evidence as to be manifestly unjust regardless of whether there is some evidence to support it. In re King's Estate (King v. King et al.), 150 Tex. 662, 244 S.W.2d 660; Purvis v. Morehead, Tex.Civ.App., 304 S.W.2d 221; Chantly v. Chrystal, Tex.Civ.App., 274 S. W.2d 765.

After carefully weighing the evidence which supports the verdict as against all the evidence to the contrary, it is our studied opinion that the jury verdict is not so contrary to the overwhelming weight of all the evidence as to be clearly wrong

and unjust, but that there was an abundance of evidence of probative value to support the jury verdict and the judgment of the trial court.

Dr. Spivey admitted that in the average retroverted uterus, "we do not do surgery on them for that unless the pain is so acute that a patient cannot go ahead * * *" There is no evidence that such character of pain existed in this case before the suspension.

He also admitted he recommended the surgery subject to the frog test and that he would not have proceeded with it had such test been positive. He said in effect that they tried to give the patient all the relief possible in such a case *with the least amount of trauma* to avoid miscarriage *or any other complication of pregnancy* and that Te-Linde, who is a recognized authority, recommends against suspension in a case of pregnancy and suggests the uterus should be put in position and held there by pessary until the first trimester of pregnancy is passed. (Emphasis ours.)

Dr. Campbell, the professor and specialist testified it is never proper to perform a suspension operation upon a pregnant woman and that when they discovered she was pregnant they should have closed the abdomen. The osteopaths claimed they did a Modified Gilliam suspension. Such operation involves sutures to the round ligaments of the uterus and Dr. Campbell found no evidence involving such ligaments.

The dimple in the abdomen was attributed to the suspension by the testimony of Dr. Pirrung, who also testified: "Something had been sewed to the abdominal wall," a procedure which he said was incompatible with pregnancy.

Appellants urge the lack of showing of proximate cause in this series of issues. It is true the record shows adhesions may be caused from any operation. However, there is probative evidence from which the jury could have concluded that the operation moved the uterus away from its retroverted position against the rectum

toward the front of the abdomen and that regardless of which type suspension was performed the operation either attached it to the abdominal wall or placed it in such proximity to the incision as to cause it to adhere thereto. Appellants should have foreseen such results.

Our Supreme Court in Port Terminal Railroad Association v. Ross, 155 Tex. 447, 289 S.W.2d 220, 224 has said:

"It has also been pointed out repeatedly that for the defendant's negligence to be regarded as a proximate cause of the plaintiff's injury, it is not necessary that the exact nature of the injury or the precise manner of its infliction should reasonably have been foreseen. It is sufficient that the defendant should reasonably have anticipated consequences or an injury of the general nature of that which ensued."

Appellant Welch did not testify personally in the case, though excerpts from his deposition were introduced. Of course Dr. Spivey denied that the operation was the cause of any suffering on the part of Mrs. Shaver, but when appellee's testimony is weighed alongside the testimony offered by appellants and their witnesses we find in considering all the evidence that it does not preponderate against the verdict.

As in all cases that are contested some of the evidence was conflicting, but "it must be borne in mind that it was the province of the jury to judge the credibility of the witnesses and the weight to be given their testimony. It was their province also to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses." Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561, 563.

What we have said concerning the great weight and preponderance of the evidence makes it unnecessary for us to write upon the no evidence point raised.

Accordingly, the judgment of the trial court is affirmed.