Vera CATON, Appellant,

v.

O. J. RICHARDSON, Appellee.

No. 7438.

Court of Civil Appeals of Texas.

Amarillo.

Feb. 22, 1965.

Allen, Allen & Reavis, Perryton, Mc-Cown & Cobb, Dumas, for appellant.

Stone & Stone, Amarillo, for appellee.

CHAPMAN, Justice.

This is an appeal from a summary judgment involving a medical malpractice case filed by Vera Caton, appellant, against O. J. Richardson, M. D., appellee, classified as a general practitioner.

The pleadings, the depositions of Dr. Richardson and Dr. Loyde H. Hudson, M. D:, and affidavits of Dr. Richardson and Mrs. Vera Caton, together with the motion for summary judgment constitute the record in the case upon which the trial court rendered its judgment. The only point before us is that a fact issue was raised by the pleadings, affidavits and depositions.

We start with the premise that has been settled by our Supreme Court, to the effect that in passing upon Rule 166-A, V.A.T.R.: "The burden of proving that there is no genuine issue of any material fact is upon the movant, and 'All doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment.'" Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929.

The court hearing the motion must determine if there are any issues of fact to be tried, and is not to weigh the evidence or determine its credibility. His "'task is analogous to that which he performs on a motion for directed verdict. He accepts as true all evidence of the party opposing the motion which tends to support such party's contention, and gives him the benefit of every reasonable inference which properly can be drawn in favor of his position.'" Gulbenkian v. Penn, supra.

The suit being a medical malpractice case there are also settled rules of evidence in Texas necessary to follow in order for a patient to make the necessary proof to constitute a cause of action for malpractice against a physician.

In 1949 in the case of Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1, our Supreme Court said:

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant:

(1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."

Later opinions have tempered the categorical statement just quoted to the extent that the general rule of exclusion is subject to certain limitations such as:

"(1) Where the particular subject of inquiry is common to and equally recognized and developed in all fields of practice * * *

"(2) [W]here the subject of inquiry relates to the manner of use of electrical and mechanical appliances in common use in all fields of practice * *." Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933.

Our own court has said in effect that it would be unrealistic, for example, to hold that medical doctors with equally as much or more training than osteopaths would not be qualified to testify against them in the field of obstetrics and gynecology, even though trained in a different school of medicine. Welch v. Shaver, Tex.Civ.App., 351 S.W.2d 588, 589 (N.R.E.). However, where the question involves testimony depending on medical diagnoses or recognized medical treatment in the medical field the rules of Bowles v. Bourdon, supra, [with certain exceptions such as some of those we have mentioned] "correctly states the recognized general rule, the basis for which is said to be that 'when a patient selects one of the several recognized schools of treatment, he thereby adopts and accepts the kind of treatment common to that school; and the care, skill, and diligence with which he is treated, when that becomes a question in the courts of this state, must be tested by the evidence of those who are trained and skilled in that particular school of treatment.'" Porter v. Puryear, supra (set aside on other grounds, Puryear v. Porter, 153 Tex. 82, 264 S.W.2d 689).

Appellant's alleged cause of action for malpractice has as its basis, that following

surgery for removal of "certain veins" of her right leg, which the medical testimony shows was the saphenous vein, she developed postoperative thrombophlebitis. Her principal contention for negligence of Dr. Richardson's diagnosis and surgical procedure that she claims proximately resulted in the edema of the right lower extremity is that his deposition shows that he gave her the Trendelenburg test to determine the patency of the deep circulation before removing the superficial vein above referred to, whereas her affidavit denies that he did so, which she contends raises a fact issue. The test mentioned involves the application of a tourniquet to the thigh to determine if the deep veins are filling, so as to leave adequate circulation in the leg after the saphenous vein is removed.

Dr. Richardson had performed his surgery for removal of the varicose vein on February 13, 1962. Because her mother was ill with pneumonia he agreed to her release four days after surgery, telling her to be up and about as much as possible and to wear elastic bandages. When she came back to see him on March 8, her leg was swollen and painful and she was admitted for thrombophlebitis. His deposition states "she had been staying with her sick mother, sitting around a lot, which is not the proper thing to do, and she always wore a heavy corset, which also interferes with the circulation, and at that time I just assumed that the blood which was left from the vein stripping had extended itself into some part of her leg causing her disturbance."

"Q. In a clot?

A. Yes, sir. Due to lack of circulation and lack of walking, lack of proper exercise and proper care."

The record also shows she had been to a doctor in Amarillo before the operation and he had recommended the removal of the varicose vein in her right leg.

The following statements in the deposition of Dr. Richardson himself constitute the principal contention relied on by appellant for raising a fact issue:

"I ran the usual test to determine the patency of the deep circulation. Apparently the deep circulation was adequate, so I consented to the operation.

"QUESTION: 'That was on the 9th of February, 1962?'

"ANSWER: 'Yes, Sir.'

"QUESTION: 'Exactly what is this test to determine the patency of the deep circulation?'

"ANSWER: 'It's commonly called the Trendelenburg test.'

"QUESTION: 'Would you describe it, please, sir?'

"ANSWER: 'Put a tourniquet around the thigh with the vein empty and see if it fills from below, which it did very slowly.'

"QUESTION: 'Why do you give this test, anyhow? This tourniquet test.'

"ANSWER: 'The tourniquet test is to determine whether the deep circulation is patent.'

"QUESTION: 'Why do you need to know that?'

"ANSWER: 'Well, if you destroy the superficial veins and there is no deep vein, you have trouble with it. There is no way for the circulation to get back to the body.'

"QUESTION: 'I assume, than, that had you known that the deep circulation was not adequate, you

would not have performed your surgery?'

"ANSWER: 'I would not have recommended that the surgery be performed, no.'

"QUESTION: 'If the deep circulation is obstructed where it will not return the blood and if you remove the superficial vein, which you removed—

"ANSWER: 'Yes, Sir.'

"QUESTION: 'What will result, Doctor?'

"ANSWER: 'The leg enlarges, and they get what we call postphlebotic syndrome or postlymphedema.' "

The record shows that Dr. Loyde H. Hudson is a thoracic and cardiovascular surgeon of Amarillo, with a total of 18½ years of college, medical school, internship, and residency training for the field of practice he follows.

His deposition testimony shows that Mrs. Caton came to him for examination on April 24, 1962, from a referral by Dr. Mok of Amarillo. An examination on that day revealed an enlarged right lower extremity that appeared to be very firm and indurated to feel. At that time he thought she had lymphangitis. He placed her in the hospital and later did a venogram, a procedure by which dye is placed in the vein at the foot and traced by X-ray to determine if the circulation passes on up the leg. If there is blockage the dye will not pass up in a normal way. He was not satisfied with the test and advised that she have an exploration of the right groin, which was performed on May 21, 1962. That test revealed evidence of marked disease in the proximal end of the femoral vein and very severe disease in the veins entering into the pelvis on the right side. The disease was thrombophlebitis. He found veins that were open but the ones at the end of the right common femoral vein were hard and stiff and not carrying blood. He expressed the belief that, some of the veins in the pelvic area, being so hard and stiff, she probably had phlebitis over a protracted period due to childbirth.

When questioned in the deposition concerning his medical opinion as to the cause of Mrs. Caton's physical condition upon which this suit is based Dr. Hudson's deposition is very positive. He said the removal of the saphenous vein showed classical surgical procedure; that if he possessed the knowledge he acquired from his information of her history, the venogram made, and the exploratory operation performed, he would have recommended the surgery that Dr. Richardson performed. He said he had no opinion as to what caused the phlebitis; that the femoral vein at the point that the saphenous vein entered into it was filled with fluid blood; that in his opinion there was no occlusion at the time of Dr. Richardson's operation.

His deposition was rather lengthy and went considerably into detail, but particularly important to the questions here involved are the following questions and answers:

"Q. Doctor, do you have an opinion as to why the plaintiff here, Mrs. Caton, did not get good results from this varicose vein surgery? If you do, just say you do have or just say you do not.

"A. Yes, I do have.

"Q. Would you give us that opinion, please?

"A. I think that she had a flare up or possible a primary, but in my opinion it was a flare up of a thrombophlebitis in the pelvic veins and in the upper end of the right common femoral vein following the surgery.

"Q. Postoperative?

"A.   Postoperative flare up of thrombophlebitis.

"Q.   Rather than the surgery itself?

"A.   I do not believe that the surgery, as I saw it, entered into it.

"Q.   With a patient in the condition that has been described both in Mr. Reavis' direct examination and these various questions I have asked you, do you have an opinion as to whether this surgical resection of the varicose veins was poorly advised?

"A.   Yes, I believe I do have an opinion.

"Q.   Will you give us that opinion, please?

"A.   From the information I have this lady had varicose veins that were helped with elastic stockings. Apparently these veins were rather severe.

As I have already testified, I believe that these varicose veins should be resected because they make the matters worse. If a deep vein is blocked off and is known to be blocked off, they will make matters worse. I think that these veins should be resected.

"Q.   This postoperative flare up of phlebitis to which you refer is not necessarily in the control of the operating surgeon, is it doctor?

"A.   It is largely outside the control of the operative surgeon providing she didn't have an acute attack of thrombophlebitis before he started. In this case, I have no reason to believe such existed."

Unquestionably, the deposition of Dr. Hudson absolves Dr. Richardson of any negligence in connection with diagnosis or surgery, or of any action that proximately caused the condition upon which her suit is based. This leaves only the affidavit and deposition of Dr. Richardson and appellant's deposition from which we must determine if a fact issue was raised.

■ Dr. Richardson said he gave the Trendelenburg test and that it showed the patency of the circulation in the deep veins was adequate to justify the operation. Mrs. Caton said he did not do the test because he never applied a tourniquet to her thigh. It places her in an anamolous position so far as proving a cause of action. If Dr. Richardson did do the test, the record shows no negligence on his part from his testimony because he found no medical reason to cause him to foresee that thrombophlebitis would later develop. If Mrs. Caton's testimony is true, and he did not do the test there still is no showing of negligence which was a proximate cause of the condition she complained about.

In stating, as Dr. Richardson did, that, "If you destroy the superficial veins and there is *no* deep vein, you have trouble with it," is not medical testimony that she had no deep functional veins. There is absolutely no medical testimony that appellant was without some deep veins that were functional. (Emphasis added).

Dr.   Hudson's   deposition   testimony shows:

"Q.   Then is it—state whether or not it is your opinion that it is a perfectly good and well-recognized surgical procedure today to resect varicose veins even if it is known that the patient has had infected deep veins to the point that they may be occluded?

"A.   Yes, it is a well-recognized procedure and can be safely done.

"Q.   Is it necessary to resect these veins?

"A.   Yes.

"Q. Why would that be necessary, Doctor?

"A. If they are varicose veins it is necessary to resect them because there is an actual downward force on the varicosities from above.

We have learned through advances in vascular-physiology that if these veins are not resected the varicosities will become worse and there will be stasis of blood in the varicosity.

Your chances of getting recurrent phlebitis is therefore made much worse.

We advise resecting these veins not only for the varicosities themselves but actually it helps cut down the incidence of recurring phlebitis.

"Q. So are you testifying then that you would consider surgical resection of varicose veins even if you knew them to be of a secondary type or if they had occurred following an episode of deep phlebitis?

"A. Yes. If the varicose veins are severe, resection of them is a perfectly good and recognized surgical procedure, even if the patient is known to have had phlebitis previously."

The deposition of Dr. Richardson shows Mrs. Caton had an enlarged, tortuous, crooked saphenous vein in her right leg and that she came to him and asked him to operate on the leg, that her husband had sent her up for the operation.

Therefore, there is no medical evidence that would justify the submission to a jury of a question of negligence which was a proximate cause of the thrombophlebitis upon which the medical malpractice suit is based.

The judgment of the trial court is affirmed.